UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| BETTY MOON<br><br>   Plaintiff,<br><br>  v.<br><br>UNITED STATES OF AMERICA,<br><br>   Defendant. | NO. CV-06-0328-EFS<br><br>**ORDER ENTERING THE COURT'S RULINGS FROM JULY 24, 2008 HEARING** |

  A hearing occurred in the above-captioned matter on July 24, 2008, in Spokane. Amos Hunter and Geoffrey Swindler appeared on behalf of Plaintiff Betty Moon; Andrew Biviano appeared on behalf of Defendant United States of America. Before the Court was Defendant's Motion for Summary Judgment. (Ct. Rec. 18.) After reviewing the submitted material, relevant authority, and hearing oral argument, the Court was fully informed and granted Defendant's motion. This Order serves to memorialize and supplement the Court's oral ruling.

**I. BACKGROUND**

  On June 27, 2003, Plaintiff entered Glacier National Park ("Glacier") accompanied by her mother, daughter-in-law, and grandson. That afternoon, the family went to the beach in front of Lake McDonald Lodge. Plaintiff sat directly under a Black Cottonwood tree conversing

ORDER ~ 1

with other park patrons and watching her grandson play near the lake. (Ct. Recs. 44 at 3; 34 at 2.) At approximately 4:00 p.m., a large branch broke off the Black Cottonwood tree and struck Plaintiff; she sustained fractures to her skull and vertebrae in her cervical, thoracic, and lumbar regions. *Id.*

Glacier covers approximately 1,600 square miles in northwestern Montana. The park is managed by the National Parks Service ("NPS"), an agency within the Department of the Interior. (Ct. Rec. 44 at 2.) NPS' mission, as statutorily defined in the Organic Act, is to

> "promote and regulate the use of the . . . national parks . . . to conserve the scenery and the natural and historic objects and the wildlife therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."

16 U.S.C. § 1. Glacier's operations are governed by three (3) policies: the first is NPS' *Management Policies 2001,* which delineates the visitor safety policy for all National Parks; the second is the Natural Resources Management Guidelines ("NPS-77"), which contains a "Hazardous Tree" section that "provides the foundation for each park to implement its own hazardous tree management plan"; and the third is Glacier's Hazard Tree Management Plan ("HTMP"), which tailors the NPS-77 hazard tree management recommendations to Glacier's individualized needs. (Ct. Recs. 25-3 at 28; 40-1 at 2, 9.)

Under the HTMP, Glacier is divided into four (4) area types: natural, developed, historic, and special use. (Ct. Rec. 44 at 4.) The Lake McDonald Lodge area - where the accident occurred - is classified as a developed area. *Id.* Developed areas are the park areas most

ORDER ~ 2

frequently occupied by visitors and employees and, consequently, are given highest priority for visitor safety. The practical effect is that developed areas are surveyed for hazardous trees more frequently than lower priority zones. *Id.* There are six (6) developed zones in Glacier, which comprise approximately 20,000 acres of parkland containing many thousands of trees. *Id.*

The HTMP mandates that the NPS conduct annual surveys of developed areas to identify hazardous trees. (Ct. Rec. 44 at 4.)  The two (2) survey types utilized to identify potentially hazardous trees are the surveillance survey and the examination survey.

The surveillance survey is a generalized method of detecting potentially hazardous trees and is administered by walking or driving through an area and visually scanning the forest for trees that exhibit signs of tree failure. (Ct. Rec. 40-1 at 6.)  Potentially hazardous trees are reported to the hazard tree team leader for further inspection through the examination survey. *Id.*

The examination survey is a more comprehensive individualized inspection, where each potentially hazardous tree identified in the surveillance survey is carefully surveyed for defects using the Hazard Rating System (HRS). (Ct. Rec. 40-1 at 6, 10.) Through a comprehensive set of techniques, the HRS balances the probability of tree failure, the probability of damage to a target (people/property), the target's value, and the aesthetic, historic, and ecological value of the tree. (Ct. Rec. 40-1 at 10.)  Trees not designated as hazardous, i.e., those without defects or with defects but not likely to fall, are monitored annually in developed areas to detect any changes in their condition. *Id.* Trees

designated as hazardous may be entirely removed, topped, or have defective limbs removed. Alternatively, the site may be closed. *Id.*

On May 8, 2003, the hazard tree work team prepared a report after performing a surveillance survey on the trees surrounding Lake McDonald Lodge. (Ct. Rec. 44 at 4.) The team did not designate the subject Black Cottonwood tree as hazardous.

## II.   DISCUSSION

### A.   Standard

Before addressing the merits of Defendant's motion, it is necessary to determine what standard applies. There are two types of motions to dismiss challenging subject matter jurisdiction: facial and factual challenges. A facial attack is based on the allegations in the complaint, together with documents attached to the complaint, judicially-noticed facts, and undisputed facts in the record. *Thornhill Publ'g Co. v. Gen. Tel & Elecs.*, 594 F.2d 730, 733 (9th Cir. 1979). A factual attack to subject matter jurisdiction is based on extrinsic evidence apart from the pleadings. *Gould Elecs., Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000). Where the jurisdictional issues and substantive issues are so intertwined that the question of jurisdiction is dependent upon the resolution of factual issues going to the merits, courts should consider the motion under the standards for summary judgment. *Thornhill Publ'g Co.*, 594 F.2d at 733-34.

Here, Plaintiff Betty Moon filed a claim under the Federal Tort Claims Act (FTCA) alleging that Defendant negligently failed to (1) identify and correct a dangerous condition posed by an aging Black Cottonwood tree branch, and (2) warn her of the subject tree's dangerous

ORDER ~ 4

condition. (Ct. Rec. 2 at 4.) Because Plaintiff's FTCA claims are intertwined with the jurisdictional question, the Court reviews Defendant's motion under the summary judgment standard.

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Once a party has moved for summary judgment, the opposing party must point to specific facts establishing that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). If the nonmoving party fails to make such a showing for any of the elements essential to its case for which it bears the burden of proof, the trial court should grant the summary judgment motion. *Id.* at 322. "When the moving party has carried its burden of [showing that it is entitled to judgment as a matter of law], its opponent must do more than show that there is some metaphysical doubt as to material facts. In the language of [Rule 56], the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986) (citations omitted) (emphasis in original opinion).

When considering a motion for summary judgment, a court should not weigh the evidence or assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). This does not mean that a court will accept as true assertions

made by the non-moving party that are flatly contradicted by the record. *See Scott v. Harris,* 127 S. Ct. 1769, 1776 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

**B.    Jurisdiction**

Federal courts are courts of limited jurisdiction; as such, they are empowered to hear only those cases that are within the judicial power of the United States as defined by the United States Constitution and those cases authorized by Congress. *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1174 (9th Cir. 2002); *Estate of Branson v. Comm'r of Internal Rev.*, 264 F.3d 904, 908 (9th Cir. 2001). Based on these limits, the party initiating the suit in federal court must affirmatively allege facts in the complaint demonstrating that the federal court has jurisdiction to hear the case. *Fifty Assocs. v. Prudential Ins. Co.*, 446 F.2d 1187, 1189 (9th Cir. 1970).

Federal courts generally lack the authority to consider and grant relief against the United States unless Congress explicitly waives sovereign immunity. Such a waiver exists under the FTCA where a plaintiff brings a claim based on a United States employee's negligence. *See* 28 U.S.C. §§ 1346, 2671, & 2674.[1]  Congress did not, however, waive

---

[1] 28 U.S.C. § 2674 sets forth, "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under

ORDER ~ 6

immunity when the action complained of is the result of a discretionary function on the part of a federal agency or an employee of the government. *Id.* This is known as the discretionary function exception.

**C.   Discretionary Function Exception**

The discretionary function exception bars "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." *Id.* The exception's purpose is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an act of tort." *United States v. Gaubert*, 499 U.S. 315, 323 (1991) (citing *United States v. Varig Airlines*, 467 U.S. 494, 813 (1984)). Accordingly, if the discretionary function exception applies to the challenged governmental conduct, the United States retains sovereign immunity, and a district court lacks subject matter jurisdiction to hear the suit. This is true even where governmental discretion may have been negligently exercised. 28 U.S.C. § 2680(a); *In Re Glacier Bay*, 71 F.3d 1447, 1451 (9th Cir. 1995). The burden of demonstrating the discretionary function exception's applicability lies with the United States. *Reed v. U. S. Dep't of the Interior*, 231 F.3d 501, 503 (9th Cir. 2000).

The Supreme Court created a two-part test to determine whether the discretionary function exception applies. *Berkovitz v. United States*, 486 U.S. 531 (1988). First, a court must determine whether a federal employee's action involves "an element of judgment or choice," i.e., it

---

like circumstances . . . ."

ORDER ~ 7

is discretionary. *Id.* at 536. If it does, then the court must decide whether that judgment "is the kind that the discretionary function exception was designed to shield," which "protects only government actions and decisions based on considerations of public policy." *Id.* at 536-37.

### 1. Part One - Discretionary Action

Defendant argues that the Court lacks subject matter jurisdiction because Glacier's policies provide park officials considerable discretion in how to manage dangerous trees. (Ct. Rec. 20 at 10-12.) Plaintiff responds that Glacier's governing policies contain mandatory language directing the NPS to thoroughly inspect all trees in developed areas.

Even viewing the evidence in Plaintiff's favor, Glacier's governing policies are discretionary in this instance. Plaintiff's sweeping assertion that each of Glacier's governing policies are mandatory is belied by the specific language in each policy. For example, Management Policies 2001 states that "[t]hese management policies do not impose park-specific visitor safety prescriptions. The means by which public safety concerns are to be addressed is left to the discretion of superintendents and other decision-makers at the park level." (Ct. Rec. 25-3 at 30.) The NPS-77 states, "[t]he following guidance may be used in developing a park plan. Each plan must be tailored to a park's particular requirements . . . ." (Ct. Rec. 25-3 at 33.)

The Management Policies 2001 and NPS-77's plain language affords broad discretion for Glacier officials to implement a hazardous tree management plan according to the park's individualized needs. Nothing

binds Glacier officials to implement the generalized schematic for hazardous tree management outlined in the policies.

Glacier's third governing policy, the HTMP, does contain a mandatory provision requiring annual surveys of developed zones: "Surveys are conducted annually in the spring, before facilities open." (Ct. Rec. 25-4 at 46.) Plaintiff interprets this provision to require an individualized examination survey of all trees in developed areas. Incorrect. Whether or not to conduct a more intensive examination survey is dependent upon park employees' discretionary determinations in the surveillance survey. (Ct. Rec. 25-4 at 48.)

Here, Glacier employees performed the mandatory annual surveillance survey on May 8, 2003, and did not identify the subject Black Cottonwood tree as potentially hazardous. Because Glacier satisfied the HTMP's only mandatory provision - the surveillance survey -, Glacier employees were not required to perform additional surveying, testing, core sampling, or mitigation in relation to the subject Black Cottonwood tree. Part one of the discretionary function analysis is satisfied because Glacier fulfilled its sole obligation under the HTMP; the remaining policies were discretionary. *See Gaubert*, 499 U.S. at 324.

**2.   Part Two - Policy Inquiry**

Defendant argues that part two is satisfied because Glacier's hazardous tree management decisions require it to balance multiple policy considerations, including cost, public safety, public access, and ecological conservation, all of which are grounded in the Organic Act. (Ct. Rec. 20 at 12.) Plaintiff responds that hazardous tree management

is part of Glacier's routine maintenance responsibilities and does not involve policy-weighing decisions. (Ct. Rec. 34 at 15.)

As stated, Defendant must demonstrate that Glacier's hazardous tree management decisions are "based on considerations of public policy" of the kind that "the discretionary function exception was designed to shield" to satisfy part two of the discretionary function test. *Berkovitz*, 486 U.S. at 536-537. Generally, courts have held that part two of the *Berkovitz* test is satisfied when NPS decisions involve a combination of policy considerations such as safety, aesthetics, environmental impact, and available financial resources. *See, e.g., Terbush v. United States*, 516 F.3d 1125, 1133-34 (9th Cir. 2008) (finding part two is satisfied where non-routine maintenance decisions implicate a balancing of policy considerations, including safety); *Merando v. United States*, 517 F.3d 160, 172, (3rd Cir. 2008) (finding part two is satisfied when the NPS "windshield inspection" program balanced visitor safety, visitor enjoyment, and park conservation); *Kiehn v. United States*, 984 F.2d 1100, 1105 (10th Cir. 1993) (finding part two is satisfied when the NPS decision not to post warning signs balanced resource allocation, visitor safety, and scenic preservation); *Autery v. United States*, 992 F.2d 1523, 1530 (11th Cir. 1993) (finding part two is satisfied where the government weighed the risk of harm from trees in various locations, the need for other safety programs, the preservation of forest's natural state, and limited financial and human resources).

Even viewing the evidence in Plaintiff's favor, part two is satisfied because Glacier employees balanced numerous policy considerations when identifying and mitigating the dangers posed by

ORDER ~ 10

hazardous trees, including (1) public safety, (2) cost, (3) public access, and (4) ecological conservation. (Ct. Rec. 40-1 at 2, 5, 10.) Plaintiff's reliance on *Terbush*, 516 F.3d at 1133-34, for the proposition that Glacier's hazardous tree management plan is nothing more than routine maintenance devoid of policy weighing decisions is misplaced because the Ninth Circuit specifically noted that maintenance decisions implicating multiple policy considerations, including safety, likely satisfy part two of the *Berkovitz* test.

Glacier's hazardous tree management plan involves balancing multiple policy considerations that extend far beyond routine maintenance, including visitor safety concerns, conservation, visitor enjoyment, park access, and cost. (Ct. Rec. 40-1 at 2, 5, 10.) Therefore, part two of the discretionary function test is met and Defendant's hazardous tree inspection, mitigation, and warning decisions are shielded from liability.

### III.  Conclusion

Accordingly, **IT IS HEREBY ORDERED**: Defendant's Motion for Summary Judgment **(Ct. Rec. 18**) is **GRANTED**.

//
//
//
//
//
//
//
//

ORDER ~ 11


**IT IS SO ORDERED.** The District Court Executive is directed to:

(1) enter this Order;

(2) provide copies to counsel;

(3) enter judgment for Defendant;

(4) strike all hearing and trial dates;

(5) close the file.

**DATED** this    4th    day of August 2008.

S/ Edward F. Shea
EDWARD F. SHEA
United States District Judge

Q:\LawClerk\Externs\2008\Kevin\Civil\2006\Dispositive Motions\328.Order Granting MSJ.wpd

ORDER ~ 12